Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Joshua D. Smith, Esq.
Blythe C. Miller, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL   INSURANCE   COMPANY   and   GEICO
CASUALTY COMPANY,

               Plaintiffs,

       -against-


VIP PHARMACY CORP., YELENA MOSHEYEVA,
DNA PHARMACY INC., OLEG LIVEYEV and JOHN
DOES "1" THROUGH "5,"

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.: _____(    )

## **COMPLAINT**

Plaintiffs,  Government  Employees  Insurance  Company,  GEICO  Indemnity  Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, VIP Pharmacy Corp., Yelena

Mosheyeva, DNA Pharmacy Inc., Oleg Liveyev, and John Does "1" through "5" (collectively, "Defendants"), hereby allege as follows:

1.      This action seeks to terminate a massive fraud scheme perpetrated by the Defendants who have exploited the New York "No-Fault" insurance system by submitting more than $5.7 million in fraudulent pharmaceutical billing to GEICO.  Specifically, the Defendants submitted, or caused to be submitted, thousands of fraudulent charges to GEICO seeking payment for a set of specifically targeted "pain relieving" topical prescription drug products, including diclofenac gels, lidocaine ointments, and pain patches (collectively, the "Fraudulent Topical Pain Products"), as well as various other medications (together with the Fraudulent Topical Pain Products, the "Fraudulent Pharmaceuticals") that were dispensed pursuant to predetermined fraudulent protocols solely to maximize profits.

2.      Defendants VIP Pharmacy Corp. ("VIP Pharmacy") and DNA Pharmacy Inc. ("DNA Pharmacy"), along with their purported owners, Yelena Mosheyeva ("Mosheyeva") and Oleg Liveyev ("Liveyev") (collectively, the "Pharmacy Defendants"), dispensed the Fraudulent Pharmaceuticals to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds") without regard to the Insureds' individual symptoms or actual medical needs.  To maximize the exploitation of the Insureds for financial gain, the Defendants targeted the prescription and dispensing of the Fraudulent Topical Pain Products, including Diclofenac 3% Gel, Lidocaine 5% Ointment, and Lidocaine 5% Patches, in place of other effective, but much-less costly prescription and non-prescription drug products because the Defendants were able to acquire them at low cost and then dispense and bill for them at exorbitant prices along with various other medications.

3.      As an essential part of the fraudulent scheme, the Pharmacy Defendants entered into illegal, collusive agreements with various healthcare providers (the "Prescribing Providers") and laypersons (the "Clinic Controllers") who work at or are associated with various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics"), and steered them to prescribe and direct large volumes of prescriptions to VIP Pharmacy and DNA Pharmacy for the Fraudulent Pharmaceuticals. The Pharmacy Defendants, in exchange for paying kickbacks, received medically unnecessary prescriptions from the Prescribing Providers and Clinic Controllers for the Fraudulent Pharmaceuticals pursuant to predetermined protocols.

4.      The scheme spearheaded by the Pharmacy Defendants to steer the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to VIP Pharmacy and DNA Pharmacy for large volumes of the Fraudulent Pharmaceuticals pursuant to their collusive arrangements egregiously inflated the charges submitted to GEICO.  For example, VIP Pharmacy and DNA Pharmacy regularly billed GEICO $944.00 for a single tube of Diclofenac 3% Gel; VIP Pharmacy and DNA Pharmacy regularly billed GEICO from $304.50 to $1,966.00 for a single tube of Lidocaine 5% Ointment; and VIP Pharmacy and DNA Pharmacy regularly billed GEICO from $251.62 to $493.20 for a single box of Lidocaine 5% Patches.

5.      By this action, GEICO seeks to recover more than $1,840,000.00 that the Pharmacy Defendants stole from it by virtue of the Defendants' fraudulent scheme.  In addition, GEICO seeks a declaration that it is not legally obligated to pay VIP Pharmacy and DNA Pharmacy for more than $2,645,000.00 in pending fraudulent No-Fault insurance claims that the Defendants submitted, or caused to be submitted, through VIP Pharmacy and DNA Pharmacy because:

     (i)      VIP Pharmacy and DNA Pharmacy billed for pharmaceutical products that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)      the Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to VIP Pharmacy and DNA Pharmacy in exchange for unlawful kickbacks and other financial incentives; and

(iii)      the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had VIP Pharmacy and DNA Pharmacy dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals.

6.      The Defendants fall into the following categories:

(i)      VIP Pharmacy and DNA Pharmacy are New York corporations that engaged in a fraudulent scheme whereby they dispensed the Fraudulent Pharmaceuticals pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, and through which the Fraudulent Pharmaceuticals were billed to GEICO and other New York insurance companies for reimbursement of No-Fault benefits to which they were not entitled;

(ii)      Mosheyeva and Liveyev are the purported owners of VIP Pharmacy and DNA Pharmacy, respectively; and

(iii)      John Doe Defendants "1"-"5"  include persons who are presently not identifiable but who (i) are associated with the Pharmacy Defendants and who have conspired with the Pharmacy Defendants to further the fraudulent scheme committed against GEICO other New York automobile insurers; and (ii)  are laypersons associated with the No-Fault Clinics and who have conspired with the Pharmacy Defendants to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

7.      The Defendants' fraudulent scheme began as early as 2014 and has continued uninterrupted to the present day.  As discussed more fully below, the Defendants at all times have known that: (i) the billed-for pharmaceutical products were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to

direct illegal prescriptions for the Fraudulent Pharmaceuticals to VIP Pharmacy and DNA Pharmacy in exchange for unlawful kickbacks and other financial incentives; and (iii) the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products that they acquired at low cost and had VIP Pharmacy and DNA Pharmacy dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals.

8.     Based on the foregoing, VIP Pharmacy and DNA Pharmacy do not now have – and has never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds.  The charts attached hereto as Exhibits "1" and "2" set forth a large representative sample of the fraudulent claims that have been identified to-date which the Defendants submitted, or caused to be submitted, to GEICO through the United States mail.  As a result of the Defendants' scheme, GEICO has incurred damages of approximately $1,840,000.00.

**THE PARTIES**

I.    **Plaintiffs**

9.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland.  GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

II.    **Defendants**

10.    Defendant VIP Pharmacy is a New York corporation, with its principal place of business at 100-05 Roosevelt Avenue, Corona, New York.  VIP Pharmacy was incorporated on or about November 23, 2012.

11.    Beginning in 2014, VIP Pharmacy knowingly submitted fraudulent billing to GEICO and continues to seek reimbursement on unpaid fraudulent claims.

12.     Defendant Mosheyeva resides in and is a citizen of New York.  Mosheyeva is the record owner of VIP Pharmacy.

13.     Defendant DNA Pharmacy is a New York corporation, with its principal place of business at 107-02 Jamaica Avenue, Richmond Hill, New York. DNA Pharmacy was incorporated on or about March 7, 2017.

14.     DNA Pharmacy was registered with New York State as a pharmacy but transferred away its registration on February 24, 2020.

15.     Beginning in 2017, DNA Pharmacy knowingly submitted fraudulent billing to GEICO and continues to seek reimbursement on unpaid fraudulent claims.

16.     Defendant Liveyev resides in and is a citizen of New York.  Liveyev is the record owner of DNA Pharmacy.

17.     John Doe Defendants "1" – "5" reside in and are citizens of New York.  John Doe Defendants "1" – "5" include persons who are presently not identifiable but (i) who are associated with the Pharmacy Defendants and who have conspired with the Pharmacy Defendants to further the fraudulent scheme committed against GEICO other New York automobile insurers; and (ii) laypersons who are associated with the N0-Fault Clinics and who have conspired with the Pharmacy Defendants to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

19.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331, over claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

20.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

21.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of New York's No-Fault Laws

22.     GEICO underwrites automobile insurance in the State of New York.

23.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.)(collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

24.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

25.     The No-Fault Laws limits reimbursement for benefits to prescription drugs only. Over-the-counter drugs and products which may be purchased without prescription are not covered expenses under the No-Fault Laws.

26.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").  In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

27.     Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

28.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

29.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

30.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.   An Overview of Applicable Licensing Laws

31.     Pursuant to New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

32.     Pursuant to 8 N.Y.C.R.R. § 63.1(7) pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

33.     Pursuant to 8 N.Y.C.R.R. § 29.1 pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

34.     Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

35.     New York Education Law § 6810 prohibits pharmacies from dispensing when a prescription form for a drug includes any other drug.  Separate prescriptions are required for each drug prescribed and dispensed.

36.     New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

37.     Pursuant to 8 N.Y.C.R.R. § 63.1(7)(ii), when a prescription is delivered to the patient off the premises of a pharmacy through mail delivery, a delivery service or otherwise, the pharmacy shall, among other things, include with each prescription a written offer to counsel the patient or person authorized to act on behalf of the patient who presents the prescription.

38.     Pursuant to New York Education Law § 6808, pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

39.     New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

40.     New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

41.     New York Education Law § 6509-a, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

### III.   The Defendants' Scheme Involving The Fraudulent Pharmaceuticals

#### A.   Overview of the Scheme

42.     Beginning in 2014, and continuing uninterrupted through the present day, the Defendants masterminded and implemented a fraudulent scheme in which they used VIP Pharmacy and DNA Pharmacy to exploit patients for financial gain by billing the New York automobile insurance industry for millions of dollars in exorbitant charges relating to the Fraudulent Pharmaceuticals purportedly provided to the Insureds.

43.     VIP Pharmacy and DNA Pharmacy purported to be separate storefront neighborhood pharmacies operating in Queens, New York but instead operated as part of a large-scale fraud scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent Pharmaceuticals, while intentionally ignoring a vast array of other medications readily available at a fraction of the cost.

44.     Notwithstanding the submission of billing under two different names and two different tax identification numbers, VIP Pharmacy and DNA Pharmacy operated as part of the same fraudulent scheme.

45.     VIP Pharmacy and DNA Pharmacy were incorporated by the same firm and designated the same agent for service of process.

46.     VIP Pharmacy and DNA Pharmacy used substantially the same font, form, and file numbers on billing submissions to GEICO.

47.     VIP Pharmacy and DNA Pharmacy used the same phone and fax numbers.

48.     VIP Pharmacy and DNA Pharmacy used the same postage meter to mail bills to GEICO from the same zip code in Rego Park, Queens.

49.     VIP Pharmacy and DNA Pharmacy employed the same fraudulent, pre-determined protocols to dispense a targeted set of pharmaceutical products in place of other effective, less costly pharmaceuticals.

50.     VIP Pharmacy and DNA Pharmacy also regularly dispensed products to the same GEICO Insureds.

51.     In many instances, the Pharmacy Defendants sought to disguise the dispensing and billing of large volumes of the Fraudulent Pharmaceuticals purportedly provided to GEICO's Insureds by splitting the dispensing and billing of the voluminous products between VIP Pharmacy and DNA Pharmacy.  For example:

> i.  Insured TL was allegedly involved in a motor vehicle accident on August 29, 2017. On September 6, 2017, she sought treatment with N.Y. Wellness Medical P.C. at a No-Fault Clinic located at 243-51 Merrick Boulevard, Rosedale, New York and underwent an examination with Kamal Tadros. M.D. ("Dr. Tadros"), who prescribed Lidocaine 5% Ointment. On September 12, 2017, VIP Pharmacy dispensed Lidocaine 5% Ointment. On November 1, 2017, DNA Pharmacy dispensed Diclofenac 3% Gel pursuant to a prescription from Gennadiy Shamalov, P.A. ("Shamalov") ordered October 31, 2017. On November 2, 2017, DNA Pharmacy dispensed Meloxicam and Cyclobenzaprine. DNA Pharmacy dispensed Meloxicam again on December 11, 2017, and Diclofenac 3% Gel on December 13, 2017. On December 14, 2017, VIP Pharmacy dispensed a Lidocaine 5% Ointment refill. On December 15, 2017, DNA Pharmacy dispensed Oxycodone-Acetaminophen. On January 26, 2018, VIP Pharmacy dispensed a Lidocaine 5% Ointment refill. On April 13, 2018, DNA Pharmacy dispensed Meloxicam and Diclofenac 1.5% Transdermal Solution pursuant to prescriptions from Alexios Apazidis, M.D. ("Dr. Apazidis"). On May 25, 2018, DNA Pharmacy again dispensed Meloxicam.
>
> ii.  Insured FB was allegedly involved in a motor vehicle accident on October 10, 2017. On October 12, 2017, he sought treatment with Corona Medical Plaza P.C. at a No-Fault Clinic located at 104-08 Roosevelt Avenue, Corona, New York and underwent an examination with James Avellini, M.D. ("Dr. Avellini"), who prescribed Diclofenac 3% Gel and Meloxicam. On October 13, 2017, DNA Pharmacy dispensed Meloxicam and Cyclobenzaprine pursuant to purported prescriptions from Shamalov. On October 24, 2017, VIP Pharmacy dispensed Lidocaine 5% Patches and Meloxicam pursuant to purported prescriptions from Dr. Avellini. On October 30, 2017, DNA Pharmacy dispensed Diclofenac 3% Gel pursuant to a prescription from Shamalov. On November 14, 2017, DNA

Pharmacy dispensed Meloxicam. On November 21, 2017, <u>VIP Pharmacy</u> dispensed Meloxicam and Lidocaine 5% Patches. On November 22, 2017, <u>DNA Pharmacy</u> dispensed a Diclofenac 3% Gel refill. On December 1, 2017, <u>DNA Pharmacy</u> dispensed Oxycodone-Acetaminophen. On April 13, 2018, <u>DNA Pharmacy</u> dispensed Meloxicam and Diclofenac 1.5% Solution. On May 24, 2018, <u>DNA Pharmacy</u> dispensed a refill of Meloxicam.

iii.  Insured AR was allegedly involved in a motor vehicle accident on October 12, 2017.  On October 17, 2017, he sought treatment with K.T. Medical Healthcare P.C. at a No-Fault Clinic located at 65-17 Myrtle Avenue, Ridgewood, New York and underwent an examination with Dr. Tadros, who prescribed Lidocaine 5% Ointment. On November 16, 2017, <u>VIP Pharmacy</u> dispensed Lidocaine 5% Ointment pursuant to the purported prescription from Dr. Tadros. On December 8, 2017, <u>DNA Pharmacy</u> dispensed Meloxicam, Oxycodone-Acetaminophen, and Diclofenac 1.5% Transdermal Solution pursuant to purported prescriptions from Dr. Apazidis. On December 21, 2017, <u>VIP Pharmacy</u> dispensed a refill of Lidocaine 5% Ointment. On January 18, 2018, <u>DNA Pharmacy</u> again dispensed Meloxicam. On March 15, 2018, <u>VIP Pharmacy</u> dispensed Ibuprofen and Cyclobenzaprine. On March 19, 2018, <u>VIP Pharmacy</u> dispensed Lidocaine 5% Ointment. On April 5, 2018, <u>DNA Pharmacy</u> again dispensed Oxycodone-Acetaminophen and Meloxicam. On April 6, 2018, <u>DNA Pharmacy</u> also dispensed Diclofenac 1.5% Transdermal Solution. On April 13, 2018, <u>VIP Pharmacy</u> again dispensed Cyclobenzaprine, Ibuprofen, and Lidocaine 5% Ointment. On May 11, 2018, <u>VIP Pharmacy</u> again dispensed Cyclobenzaprine and Lidocaine 5% Ointment.

iv.  Insured LF was allegedly involved in a motor vehicle accident on December 5, 2017. On December 14, 2017 he sought treatment with Corona Medical Plaza P.C. at the No-Fault Clinic located at 104-08 Roosevelt Avenue, Corona, New York and underwent an examination with Dr. Avellini, who issued a prescription for Diclofenac 3% Gel and Meloxicam. The Diclofenac 3% Gel and Meloxicam were dispensed by <u>VIP Pharmacy</u> on December 21, 2017 and again on January 25, 2018. On February 8, 2018, <u>DNA Pharmacy</u> dispensed Oxycodone-Acetaminophen to L.F., and on February 23, 2018dispensed Oxycodone-Acetaminophen and Meloxicam. On February 24, 2018, <u>DNA Pharmacy</u> dispensed Diclofenac 1.5% Transdermal Solution pursuant to a prescription by Shamalov. <u>DNA Pharmacy</u> also dispensed Meloxicam on April 3, 2018.

v.  Insured JA was allegedly involved in a motor vehicle accident on March 5, 2018. On March 6, 2018 he sought treatment with Alexios Apazidis, M.D. P.C. at a No-Fault Clinic located at 200-01 Linden Boulevard, Saint Albans, New York and underwent an examination with Shamalov. On March 14, 2018 he sought treatment with NY Wellness Medical P.C. at a No-Fault Clinic located at 243-49 Merrick Boulevard, Rosedale, New York and underwent examinations with Dr. Tadros, who prescribed Flexeril and Lidocaine 5% Ointment.  On March 21, 2018 <u>DNA Pharmacy</u> dispensed Lidocaine 5% Ointment pursuant to a purported

prescription from Shamalov. On March 22, 2018 <u>VIP Pharmacy</u> dispensed Cyclobenzaprine, although no prescription was attached in support of the bill to GEICO. On March 29, 2018, <u>DNA Pharmacy</u> dispensed Meloxicam, although no prescription was attached in support of the bill to GEICO.  On April 4, 2018, <u>VIP Pharmacy</u> dispensed Lidocaine 5% Ointment pursuant to a purported prescription from Dr. Tadros, then refilled the prescription on April 23, 2018. On April 30, 2018, <u>DNA Pharmacy</u> again dispensed Meloxicam, and on May 17, 2018 they dispensed Oxycodone-Acetaminophen. On May 18, 2018, <u>DNA Pharmacy</u> then dispensed Diclofenac 1.5% Transdermal Solution pursuant to a purported prescription from Dr. Apazidis ordered the day before. On May 21, 2018, <u>VIP Pharmacy</u> dispensed a Lidocaine 5% Ointment refill.

vi.    Insured RF was allegedly involved in a motor vehicle accident on April 30, 2018. On May 3, 2018 he sought treatment with K.T. Medical Healthcare P.C. at a No-Fault Clinic located at 65-17 Myrtle Avenue, Ridgewood, New York and underwent an examination with Dr. Tadros, who prescribed Flexeril, Motrin, and Lidocaine 5% Ointment. On May 13, 2018, <u>VIP Pharmacy</u> dispensed Cyclobenzaprine, Ibuprofen, and Lidocaine 5% Ointment. On June 18, 2018, <u>VIP Pharmacy</u> dispensed a refill of Lidocaine 5% Ointment. On June 21, 2018, <u>DNA Pharmacy</u> dispensed Oxycodone-Acetaminophen, Meloxicam, and Diclofenac Sodium 1.5% Transdermal Solution pursuant to purported prescriptions from Dr. Apazidis. On July 18, 2018, <u>VIP Pharmacy</u> again dispensed a refill of Lidocaine 5% Ointment.

vii.    Insured JC was allegedly involved in a motor vehicle accident on May 21, 2018. On May 24, 2018 he sought treatment with Corona Medical Plaza P.C. at a No-Fault Clinic located at 104-08 Roosevelt Avenue, Corona, New York and underwent an examination with Dr. Avellini, who prescribed Diclofenac 3% Gel. On May 30, 3018, <u>VIP Pharmacy</u> dispensed Diclofenac 3% Gel pursuant to this purported prescription from Dr. Avellini. <u>VIP Pharmacy</u> then dispensed a refill of Diclofenac 3% Gel on June 27, 2018. On July 5, 2018, <u>DNA Pharmacy</u> dispensed Meloxicam and Cyclobenzaprine pursuant to a purported prescription from Dr. Apazidis. On July 7, 2018, <u>DNA Pharmacy</u> then also dispensed Diclofenac 1.5% Transdermal Solution. On July 25, 2018, <u>VIP Pharmacy</u> dispensed a refill of Diclofenac 3% Gel. On August 10, 2018, <u>DNA Pharmacy</u> dispensed Meloxicam and Cyclobenzaprine.

viii.    Insured JF was allegedly involved in a motor vehicle accident on November 8, 2018. On November 20, 2018 he sought treatment with K.T. Medical Healthcare P.C. at a No-Fault Clinic located at 65-17 Myrtle Avenue, Ridgewood, New York and underwent an examination with Dr. Tadros, who prescribed Flexeril, Motrin, and Lidocaine 5% Ointment. On November 30, 2018, <u>VIP Pharmacy</u> dispensed Cyclobenzaprine, Ibuprofen, and Lidocaine 5% Ointment. On December 14, 2018, <u>DNA Pharmacy</u> dispensed Oxycodone-Acetaminophen, Meloxicam, and Diclofenac 1.5% Transdermal Solution pursuant to purported prescriptions from Dr. Apazidis. On January 4, 2019, <u>DNA Pharmacy</u> again dispensed Oxycodone-

Acetaminophen and Meloxicam.  On January 7, 2019 and January 31, 2019, <u>VIP Pharmacy</u> dispensed Lidocaine 5% Ointment refills. On February 8, 2019, <u>DNA Pharmacy</u> dispensed Meloxicam and Diclofenac 1.5% Transdermal Solution. On March 9, 2019, <u>DNA Pharmacy</u> also dispensed Meloxicam.

52.     There are more than 120 GEICO Insureds treating at various medical clinics that primarily cater to patients with No-Fault insurance (i.e., the "No-Fault Clinics") who were dispensed pharmaceutical products by both VIP Pharmacy and DNA Pharmacy.

53.     Many of the No-Fault Clinics where the prescriptions originated and were steered to VIP Pharmacy and DNA Pharmacy presented themselves to be legitimate healthcare practices when, in fact, they are medical mills that house a "revolving door" of numerous healthcare providers that subjected Insureds to as many healthcare good and services as possible in order to exploit their No-Fault Benefits by submitting large volumes of fraudulent claims to No-Fault insurers such as GEICO.

54.     In keeping with the fact that Pharmacy Defendants illegally steered the Prescribing Providers and the Clinic Controllers associated with the No-Fault Clinics to provide VIP Pharmacy and DNA Pharmacy with prescriptions for the Fraudulent Pharmaceuticals pursuant to predetermined fraudulent protocols, Insureds were never given the option to use a pharmacy of their choosing.

55.     Instead, the Pharmacy Defendants colluded with the Prescribing Providers and Clinic Controllers to ensure that they directed the prescriptions for the Fraudulent Pharmaceuticals to VIP Pharmacy and DNA Pharmacy, regardless of the distance of the pharmacy from the Insureds or the No-Fault Clinics where they were treating.

56.     In most cases, VIP Pharmacy and DNA Pharmacy either purported to deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes or the Fraudulent Pharmaceuticals

were given to Insureds directly by the front desk staff at the various No-Fault Clinics without the Insured ever seeing the prescription.

57.     In some cases, the Insureds were not even aware that a Fraudulent Pharmaceutical was prescribed to them until the medication was delivered to them or distributed to them by the front desk staff at the various No-Fault Clinics.

**B.  The Fraudulent Pharmaceuticals Were Prescribed and Dispensed Without Regard for Genuine Patient Care In Order to Exploit Patients for Financial Gain**

58.     In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, the Insureds treated by the Prescribing Providers at No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from VIP Pharmacy and DNA Pharmacy - were routinely subjected to pre-determined treatment protocols, which lacked individualized care and did not utilize evidence based practices with the goal of the Insureds' timely return to good health.

59.     Despite the basic goal of medical treatment being to help patients get better in a timely manner, the treatment reports for the Insureds who received pharmaceuticals from VIP Pharmacy and DNA Pharmacy almost uniformly reflected that the Insureds did not get better, did not return to good health, and did not experience improvement in their conditions such that the Insureds could terminate medical treatment expeditiously and return to normal activity.

60.     Rather, as part of the pre-determined protocols, the Prescribing Providers produced generic, preprinted, and boilerplate examination reports designed to justify continuing voluminous and excessive healthcare services that the No-Fault Clinic providers purported to render to Insureds. These healthcare services included the prescription of medically unnecessary pharmaceutical drug products such as the Fraudulent Pharmaceuticals.

61.     Notwithstanding the creation of the examination reports, the Prescribing Providers'
prescriptions of the Fraudulent Pharmaceuticals dispensed by VIP Pharmacy and DNA Pharmacy
were based on pre-determined protocols, designed to exploit the Insureds' for financial gain,
without regard to the genuine needs of the patients.

62.     In keeping with the fact that the Fraudulent Pharmaceuticals were prescribed,
dispensed, and billed pursuant to fraudulent, predetermined protocols and collusive arrangements,
in many instances the Pharmacy Defendants obtained written authorization from an Insured to seek
reimbursement directly from GEICO for the pharmaceuticals allegedly dispensed to that particular
Insured *before* the Prescribing Providers had even authorized the prescription or performed an
evaluation to determine the Insured's need for a pharmaceutical product.

63.     In particular, VIP Pharmacy and DNA Pharmacy often prepared and obtained
written authorizations from Insureds – in the form of an executed "Assignment of Benefit"
("AOB") form – that authorized the pharmacy to seek reimbursement directly from GEICO for
pharmaceuticals *before* the Prescribing Provider had even issued a prescription or performed an
evaluation to determine the Insureds' need for pharmaceuticals.

64.     AOBs are documents prepared by VIP Pharmacy and DNA Pharmacy, and signed
by their owners, and submitted to GEICO as part of the claim submission procedure to obtain
payment of No-Fault Benefits.

65.     Examples of AOBs prepared and signed by the Pharmacy Defendants in advance
pursuant to the fraudulent, predetermined protocols and collusive arrangements, are as follows:

> i.  Insured BC was allegedly involved in a motor vehicle accident on October 30,
>     2017. Thereafter, she sought treatment with Corona Medical Plaza P.C. at a No-
>     Fault Clinic located at 104-08 Roosevelt Avenue, Corona, New York. On
>     November 8, 2017, she underwent an initial examination with Dr. Avellini who
>     indicated in his initial evaluation that prescriptions for Diclofenac 3% Gel and
>     Mobic would be issued.  BC executed an AOB assigning her No-Fault Benefits

to VIP Pharmacy on November 7, 2017 – *the day before* the examination that determined the prescriptions were "medically necessary."

ii. Insured MRG was allegedly involved in a motor vehicle accident on April 26, 2018. Thereafter, she sought treatment with K.T. Healthcare P.C. at a No-Fault Clinic located at 65-17 Myrtle Avenue, Ridgewood, New York. On May 1, 2018, she underwent an initial examination with Dr. Tadros who indicated in his initial evaluation that prescriptions for Flexeril, Lidocaine 5% Ointment, and Mobic would be issued. MRG executed an AOB assigning her No-Fault Benefits to VIP Pharmacy on April 30, 2018 – *the day before* the examination that determined the prescriptions were "medically necessary."

iii. Insured AM was allegedly involved in a motor vehicle accident on September 6, 2018. Thereafter, he sought treatment with JAGA Medical Services P.C. at a No-Fault Clinic located at 1900B Ralph Avenue, Brooklyn, New York. On September 12, 2018, he underwent an initial examination with Dr. Avellini who indicated in his initial evaluation that prescriptions for Diclofenac 3% Gel and Mobic would be issued. AM executed an AOB assigning his No-Fault Benefits to DNA Pharmacy on September 7, 2018 – *five days before* the examination that determined the prescriptions were "medically necessary."

iv. Insured DP was allegedly involved in a motor vehicle accident on May 25, 2019. Thereafter, she sought treatment with N.Y. Wellness Medical P.C. at a No-Fault Clinic located at 243-51 Merrick Boulevard, Rosedale, New York. On May 30, 2019, she underwent an initial examination with Dr. Tadros who indicated in his initial evaluation that prescriptions for Flexeril and Lidocaine 5% Ointment would be issued. DP executed an AOB assigning her No-Fault Benefits to VIP Pharmacy on May 28, 2019 – *two days before* the examination that determined the prescriptions were "medically necessary."

v. Insured NL was allegedly involved in a motor vehicle accident on April 2, 2018. Thereafter, she sought treatment with Corona Medical Plaza P.C. at a No-Fault Clinic located at 104-08 Roosevelt Avenue, Corona, New York. On April 17, 2018, he underwent an initial examination with Dr. Avellini who indicated in his initial evaluation that a prescription for Diclofenac 3% Gel would be issued. NL executed an AOB assigning his No-Fault Benefits to VIP Pharmacy on April 11, 2018 – approximately *one week before* the examination that determined the prescriptions were "medically necessary."

vi. Insured CO was allegedly involved in a motor vehicle accident on September 6, 2018. Thereafter, she sought treatment with JAGA Medical Services P.C. at a No-Fault Clinic located at 107-04 Jamaica Avenue, Jamaica, New York. On October 10, 2018, she underwent an initial examination with Dr. Avellini who indicated in his initial evaluation that a prescription for Diclofenac 3% Gel would be issued. CO executed an AOB assigning her No-Fault Benefits to DNA Pharmacy on

September 18, 2018 - approximately *three weeks before* the examination that determined the prescriptions were "medically necessary."

vii.   Insured NV was allegedly involved in a motor vehicle accident on April 15, 2019. Thereafter, he sought treatment with Inwood Medical Care PLLC at a No-Fault Clinic located at 64 Nagle Avenue, New York, New York. On April 22, 2019, he underwent an initial examination with Yvette Abraham, M.D. ("Dr. Abraham"), who indicated in her initial evaluation that Methocarbamol and Etodolac would be prescribed.  NV executed an AOB assigning her No-Fault Benefits to VIP Pharmacy on April 16, 2019 – approximately *one week before* the examination that determined the prescriptions were "medically necessary."

viii.   Insured JDP was allegedly involved in a motor vehicle accident on August 8, 2018. Thereafter, he sought treatment with JAGA Medical Services P.C. at a No-Fault Clinic located at 107-04 Jamaica Avenue, Richmond Hill, New York. On August 15, 2018, he underwent an examination with Dr. Avellini, who indicated in his initial evaluation that Diclofenac 3% Gel and Mobic would be prescribed. JDP executed an AOB assigning his No-Fault Benefits to DNA Pharmacy on August 13, 2018 – *two days before* the examination that determined the prescriptions were "medically necessary."

ix.   Insured KW was allegedly involved in a motor vehicle accident on July 11, 2018. Thereafter, she sought treatment with N.Y. Wellness Medical P.C. at a No-Fault Clinic located at 243-51 Merrick Boulevard, Rosedale, New York.  On July 18, 2018, she underwent an examination with Dr. Tadros, who indicated in his initial evaluation that Lidocaine 5% Ointment and Flexeril would be prescribed.  KW executed an AOB assigning her No-Fault Benefits to VIP Pharmacy on July 12, 2018 – *six days before* the examination that determined the prescriptions were "medically necessary."

x.   Insured RM was allegedly involved in a motor vehicle accident on April 2, 2018. Thereafter, she sought treatment with Corona Medical Plaza P.C. at a No-Fault Clinic located at 104-08 Roosevelt Avenue, Corona, New York. On April 11, 2018, she underwent an initial examination with Dr. Avellini who indicated in his initial evaluation that a prescription for Diclofenac 3% Gel and Mobic would be issued.  RM executed an AOB assigning her No-Fault Benefits to VIP Pharmacy on April 10, 2018 – *the day before* the examination that determined the prescriptions were "medically necessary."

66.   VIP Pharmacy and DNA Pharmacy obtained written authorization from Insureds to bill for pharmaceuticals *before* the Prescribing Providers had even authorized the prescription or performed an evaluation to determine the Insureds' needs for pharmaceuticals because the

prescribing and dispensing of the Fraudulent Pharmaceuticals was predetermined and did not depend on the results of the examinations of the Insureds.

67.     Moreover, in those instances where the examinations were performed before the Pharmacy Defendants were preparing to dispense and bill the Fraudulent Pharmaceuticals, the Prescribing Providers failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals.

68.     Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history demonstrates a gross indifference to patient health and safety as the Prescribing Providers often did not know whether the patient was currently taking any medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed drug.

69.     The Prescribing Providers also did not document in their examination reports whether the patients were intolerant of oral medications that may necessitate a prescription for a Fraudulent Topical Pain Product dispensed by VIP Pharmacy and DNA Pharmacy.

70.     The Prescribing Providers also continuously failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by the Pharmacy Defendants were actually used by the patient.

71.     The Prescribing Providers also continuously failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by VIP Pharmacy and DNA Pharmacy provided any pain relief to the patient or were otherwise effective for the purpose prescribed.

72.     At times, the Prescribing Providers failed to document in any of their examination reports that the patient even received a Fraudulent Pharmaceutical. For example:

      i.   Insured MB was allegedly involved in a motor vehicle accident on June 4, 2015. She sought treatment with Neighborhood Medical Health Care P.C. at a No-Fault

Clinic located at 170 West 233rd Street, Bronx, New York. She underwent an initial examination with Denny Rodriguez, M.D. ("Dr. Rodriguez") on June 9, 2015. Dr. Rodriguez did not indicate on his examination reports that any medications were being prescribed. Nevertheless, on July 1, 2015, VIP Pharmacy dispensed and billed for Ibuprofen, Flector 1.3% Patches, and Metaxalone. MB underwent a follow-up examination with Dr. Rodriguez on July 23, 2015, at which time no medications were indicated in the examination report. Nevertheless, on August 3, 2015 VIP Pharmacy dispensed and billed for Ibuprofen, Flector 1.3% Patches, and Metaxalone.

ii.   Insured OLM was allegedly involved in a motor vehicle accident on August 31, 2016. He sought treatment with Corona Medical Plaza P.C. at a No-Fault Clinic located at 104-08 Roosevelt Avenue, Corona, New York. He underwent an initial examination with Dr. Avellini on September 8, 2016. Despite the fact that the Fraudulent Pain Products dispensed by the Pharmacy Defendants are pre-printed in the treatment plan section of Corona Medical Plaza P.C.'s examination reports, Dr. Avellini left this section of the treatment plan blank indicating that no medications were prescribed. Nevertheless, on September 9, 2016, VIP Pharmacy dispensed and billed for Flector 1.3% Patches. OLM underwent a follow-up examination with Dr. Avellini on November 15, 2016, at which time no medications were indicated on the examination report. Nevertheless, once again on November 18, 2016, VIP Pharmacy dispensed and billed for Flector 1.3% Patches.

iii.   Insured JV was allegedly involved in a motor vehicle accident on August 20, 2016. He sought treatment with Corona Medical Plaza P.C. at a No-Fault Clinic located at 104-08 Roosevelt Avenue, Corona, New York. He underwent an initial examination with Dr. Avellini on September 8, 2016. Despite the fact that the Fraudulent Pain Products dispensed by the Pharmacy Defendants are pre-printed in the treatment plan section of Corona Medical Plaza P.C.'s examination reports, Dr. Avellini left this section of the treatment plan blank indicating that no medications were prescribed. Nevertheless, on September 9, 2016, VIP Pharmacy dispensed and billed for Flector 1.3% Patches.

iv.   Insured BC was allegedly involved in a motor vehicle accident on April 8, 2019. She sought treatment with N.Y. Wellness Medical P.C. at a No-Fault Clinic located at 243-51 Merrick Boulevard, Rosedale, New York. She underwent an initial examination with Dr. Tadros on April 10, 2019. Despite the fact that the Fraudulent Pain Products dispensed by the Pharmacy Defendants are pre-printed in the Recommendations section of N.Y. Wellness Medical P.C.'s examination reports, Dr. Tadros left this section of the treatment plan blank indicating that no medications were prescribed. Nevertheless, on April 17, 2019, VIP Pharmacy dispensed and billed for Cyclobenzaprine, and on April 23, 2019 dispensed and billed for Lidocaine 5% Ointment.  BC underwent a follow-up examination with Dr. Tadros on May 9, 2019, at which time no medications were indicated on the

examination report. Nevertheless, on July 3, 2019, VIP Pharmacy dispensed and billed for Lidocaine 5% Ointment.

v.   Insured VP was allegedly involved in a motor vehicle accident on February 6, 2019.  He sought treatment with JAGA Medical Services P.C. at a No-Fault Clinic located at 107-04 Jamaica Avenue, Richmond Hill, New York.  He underwent an initial examination with Dr. Avellini on February 13, 2019.  In the pre-printed section of the initial examination report, Dr. Avellini indicated that VP would be prescribed Diclofenac 3% Gel.  VP then underwent a follow-up examination with Dr. Avellini on March 27, 2019, where Dr. Avellini failed to indicate in his examination report that he had previously prescribed VP a Fraudulent Pharmaceutical. DNA Pharmacy then subsequently dispensed and billed for Diclofenac 3% Gel on April 4, 2019.   VP underwent another follow up examination with Dr. Avellini on May 8, 2019, at which time Dr. Avellini again failed to indicate in his examination report that VP had previously received a Fraudulent Pharmaceutical.

vi.   Insured KF was allegedly involved in a motor vehicle accident on July 15, 2019.  He sought treatment with N.Y. Wellness Medical P.C. at a No-Fault Clinic located at 243-51 Merrick Boulevard, Rosedale, New York.  He underwent an initial examination with Dr. Tadros on July 22, 2019.  In the pre-printed section of the treatment plan, Dr. Tadros indicated that KF would be prescribed Lidocaine 5% Ointment and Flexeril.   VIP Pharmacy then dispensed and billed for Lidocaine 5% Ointment and Cyclobenzaprine on August 6, 2019. KF underwent a follow-up examination with Dr. Tadros on August 22, 2019, at which time no medications were indicated on the examination report despite the Fraudulent Pain Products being pre-printed in the recommendations section of the examination report.  Nevertheless, VIP Pharmacy continued to dispense and bill for Lidocaine 5% Ointment on September 4, 2019, September 19, 2019, and October 22, 2019, despite only two refills being indicated on the original prescription.

vii.   Insured ND was allegedly involved in a motor vehicle accident on August 3, 2019.  She sought treatment with JAGA Medical Services P.C. at a No-Fault Clinic located at 1900B Ralph Avenue, Brooklyn, New York.  She underwent an initial examination with Alicia Nicholls, P.A. on August 14, 2019.  In the pre-printed section of the initial examination report, P.A. Nicholls indicated that ND would be prescribed Diclofenac 3% Gel and Mobic.  DNA Pharmacy then dispensed and billed for Diclofenac 3% Gel and Meloxicam on August 19, 2019 and September 19, 2019.   ND underwent follow-up examination with P.A. Nicholls on September 25, 2019, at which time P.A. Nicholls failed to indicate in her examination report that ND had previously received a Fraudulent Pharmaceutical.

viii.   Insured CN was allegedly involved in a motor vehicle accident on November 7, 2019.   She sought treatment with Rutland Medical P.C. at a No-Fault Clinic located at 145 East 98th Street, Brooklyn, New York.  She underwent an initial

examination with Ilonna Yelizar, P.A., who did not indicate any prescriptions on the treatment plan, instead writing that CN would take "Tylenol as needed." Nevertheless, DNA Pharmacy dispensed and billed for Lidocaine 5% Ointment and a heating pad on November 19, 2019.

73.     In keeping with the fact that the Prescribing Providers prescribed, and the Pharmacy Defendants dispensed, the Fraudulent Pharmaceuticals in order to exploit the Insureds' for financial gain without regard for patient care, patients were often prescribed a significant amount of pharmaceuticals, often duplicative of each other and without appropriate documentation or referencing of same in the treatment reports.

74.     For example, an Insured named IP was allegedly involved in an automobile accident. For this Insured alone, DNA Pharmacy billed GEICO a total of approximately $5,591.56 for purportedly dispensing multiple rounds of Lidocaine 5% Ointment, Meloxicam, and Diclofenac 3% Gel, with multiple doctors purporting to prescribe the voluminous drugs to the Insured at different times, often without addressing the other drugs already prescribed, as shown below:

- On August 29, 2017, Insured IP was allegedly involved in an automobile accident.

- On or about September 18, 2017, the Insured presented at a No-Fault Clinic located at 107-04 Jamaica Avenue, Jamaica for an initial examination by Dr. Avellini of JAGA Medical Services P.C. Dr. Avellini's initial examination report makes no mention of any prior medication taken by the Insured, but he then checked off Lidocaine 5% Ointment and Mobic (Meloxicam) on a preprinted list of medications on the initial evaluation form.

- On or about September 19, 2017, DNA Pharmacy purportedly dispensed to the Insured Lidocaine 5% Ointment and Meloxicam tablets.

- On or about September 26, 2017, the Insured presented for an initial examination by Laxmidhar Diwan, M.D. ("Dr. Diwan") of Queens Arthroscopy & Sports Medicine. Dr. Diwan's report failed to address the prior prescriptions or medications taken by the Insured.

- On or about October 16, 2017, Dr. Avellini of JAGA Medical Services P.C. conducted a follow-up examination of the Insured. Dr. Avellini failed to address the prior prescriptions or medications, leaving the preprinted checklist of medications blank.

- On or about November 6, 2017, the Insured appeared for an initial exam by Rafael Robenov, PA and Jonathan Landow, M.D. ("Dr. Landow") of Paramount Medical Services P.C. Their report failed to address the prior prescriptions or medications taken by the Insured.

- On or about November 27, 2017, Dr. Avellini of JAGA Medical Services P.C. conducted a follow-up examination of the Insured. Dr. Avellini failed to address the prior prescriptions or medications, leaving the preprinted checklist of medications blank.

- On or about November 29, 2017, DNA Pharmacy purportedly dispensed to the Insured Meloxicam tablets.

- On or about December 28, 2017, DNA Pharmacy purportedly dispensed to the Insured Lidocaine 5% Ointment.  This bill to GEICO was "supported" by an electronic prescription purportedly by Dr. Avellini dated September 19, 2017 and an AOB form signed by the Insured on August 30, 2017 – *several weeks before the Insured's first examination at Avellini's office*.

- Also on or about December 28, 2017, DNA Pharmacy purportedly dispensed to the Insured Diclofenac 3% Gel. This bill to GEICO was "supported" by an electronic prescription purportedly by Dr. Avellini dated November 27, 2017.

- On or about January 10, 2018, DNA Pharmacy purportedly dispensed to the Insured Meloxicam tablets.

- On or about January 11, 2018, DNA Pharmacy purportedly dispensed to the Insured Diclofenac 3% Gel. This bill to GEICO was "supported" by an electronic prescription purportedly by Dr. Avellini dated November 27, 2017.

- On or about January 11, 2018, DNA Pharmacy purportedly dispensed to the Insured Lidocaine 5% Ointment. This bill to GEICO was "supported" by an electronic prescription purportedly by Dr. Avellini dated September 19, 2017.

- On or about February 7, 2018, Dr. Avellini of JAGA Medical Services P.C. conducted another examination of the Insured. Dr. Avellini failed to address the prior prescriptions or medications, leaving the preprinted checklist of medications blank.

- On or about March 29, 2018, DNA Pharmacy purportedly dispensed to the Insured Meloxicam tablets.

- On or about March 30, 2018, the Insured presented for an initial examination by Teddy Calixte, PA and. William Jones, M.D. ("Dr. Jones") of Phoenix Medical Services P.C. d/b/a Rockville Center Pain Management and Rehabilitation. Their report stated, "Taking None" under "Medications."

- On or about March 31, 2018, DNA Pharmacy purportedly dispensed to the Insured Lidocaine 5% Ointment. This bill to GEICO was "supported" by an electronic prescription purportedly by Dr. Avellini dated September 19, 2017.

75.     As another example, an Insured named JDC was allegedly involved in an automobile accident. For this Insured alone, DNA Pharmacy billed GEICO approximately $7,790.03 for purportedly dispensing multiple rounds of Diclofenac 3% Gel and Meloxicam, Diclofenac Sodium Transdermal Solution 1.5% and Meloxicam, Diclofenac tablets, Meloxicam and Oxycodone/Apap, Diclofenac Sodium Transdermal Solution 1.5%, Lidocaine 5% Patches, Diclofenac Sodium tablets, and Gabapentin, with different doctors purporting to prescribe the voluminous drugs to the Insured at different times, often without addressing the other drugs prescribed, as shown below:

- On August 8, 2018, Insured JDC was allegedly involved in an automobile accident.

- On August 15, 2018, the Insured presented at a No-Fault Clinic located at 107-04 Jamaica Avenue, Richmond Hill, New York for an initial examination by Dr. Avellini of JAGA Medical Services P.C. Dr. Avellini's initial examination report noted that the patient was taking Ibuprofen but then checked off Diclofenac 3% Gel and Mobic (meloxicam) on a pre-printed list of medications on the initial evaluation form.

- On or about August 15, 2018, DNA Pharmacy purportedly dispensed to the Insured Diclofenac 3% Gel. Notably, the Insured executed an AOB assigning his benefits to DNA Pharmacy on August 13, 2018 – *before the Insured even had his initial evaluation with Dr. Avellini*.

- On or about August 29, 2018, DNA Pharmacy purportedly dispensed to the Insured Meloxicam.

- On or about October 8, 2018, Zhanna Nudelman, M.D. ("Dr. Nudelman") of JAGA Medical Services P.C. conducted a further examination of the Insured.

Dr. Nudelman failed to address the prior prescriptions or medications and noted "none" in connection with the Insured's "current medications."

- On or about October 16, 2018, Dr. Avellini of JAGA Medical Services P.C. conducted another examination of the Insured and failed to address the prior prescriptions or medications, leaving the preprinted checklist of medications blank.

- On or about October 26, 2018, Dr. Apazidis of Total Spine and Sports Care conducted another examination of the Insured. Dr. Apazidis failed to address the prior prescriptions or medications and listed the patient's "current medications" as only Ibuprofen. Dr. Apazidis recommended Diclofenac Sodium Transdermal Solution 1.5% and Mobic (Meloxicam).

- On or about November 1, 2018, DNA Pharmacy purportedly dispensed to the Insured Meloxicam.

- On or about November 2, 2018, DNA Pharmacy purportedly dispensed Diclofenac Sodium Transdermal Solution 1.5%.

- On or about November 6, 2018, DNA Pharmacy purportedly dispensed Diclofenac tablets.

- On or about November 13, 2018, Dr. Avellini of JAGA Medical Services P.C. conducted another examination of the Insured and failed to address the prior prescriptions or medications, leaving the preprinted checklist of medications blank.

- On December 7, 2018, DNA Pharmacy purportedly dispensed to the Insured Meloxicam and Oxycodone/Apap, both purportedly prescribed by Dr. Apazidis.

- On December 12, 2018, DNA Pharmacy purportedly dispensed to the Insured Diclofenac Sodium Transdermal Solution 1.5%.

- On or about December 19, 2018, Dr. Avellini of JAGA Medical Services P.C. conducted another examination of the Insured and failed to address the prior prescriptions or medications, leaving the preprinted checklist of medications blank.

- On or about December 19, 2018, DNA Pharmacy purportedly dispensed to the Insured Diclofenac 3% Gel.

- On or about December 28, 2018, DNA Pharmacy purportedly dispensed to the Insured Meloxicam.

- On or about January 14, 2019, DNA Pharmacy purportedly dispensed to the Insured Diclofenac 3% Gel.

- On or about January 29, 2019, Dr. Avellini of JAGA Medical Services P.C. conducted another examination of the Insured and failed to address the prior prescriptions or medications, leaving the preprinted checklist of medications blank.

- On or about February 21, 2019, DNA Pharmacy purportedly dispensed to the Insured Meloxicam.

- On or about February 27, 2019 Dr. Avellini of JAGA Medical Services P.C. conducted another examination of the Insured and failed to address the prior prescriptions or medications, leaving the preprinted checklist of medications blank.

- On or about March 14, 2019, Dr. Apazidis of Total Spine and Sports Care conducted another examination of the Insured. Dr. Apazidis did not address the multiple prior prescriptions for Diclofenac 3% Gel or the prescription for Oxycodone/Apap but listed the Insured's current medications as Diclofenac Sodium Transdermal Solution 1.5%, Mobic (Meloxicam) and Ibuprofen.

- On or about March 20, 2019, DNA Pharmacy purportedly dispensed to the Insured Meloxicam.

- On or about April 1, 2019, Dr. Apazidis of Total Spine and Sports Care conducted another examination of the Insured. Dr. Apazidis listed the Insured's current medications as Diclofenac Sodium Transdermal Solution 1.5%, Mobic (Meloxicam) and Ibuprofen.

- On or about April 2, 2019, Dr. Avellini of JAGA Medical Services P.C. conducted another examination of the Insured and failed to address the prior prescriptions or medications, leaving the preprinted checklist of medications blank.

- On or about April 9, 2018, Leonid Reyfman M.D. ("Dr. Reyfman") of LR Medical PLLC conducted another examination of the Insured and his report failed to address the prior prescriptions or medications and instead recommended a Flector Patch 1.3%, Diclofenac Sodium tablets, and Cyclobenzaprine tablets.

- On or about April 9, 2019, DNA Pharmacy purportedly dispensed to the Insured Lidocaine 5% Patches, Diclofenac Sodium tablets, and Cyclobenzaprine tablets.

- On or about April 18, 2019, Dr. Apazidis of Total Spine and Sports Care conducted another examination of the Insured. Dr. Apazidis did not address the prior prescriptions or medications and neglected to even mention as "current medications" the Lidocaine 5% Patches, Diclofenac Sodium tablets, and Cyclobenzaprine tablets that were allegedly dispensed to the Insured one week prior.

- On or about May 2, 2019, Dr. Avellini of JAGA Medical Services P.C. conducted another examination of the Insured and failed to address the prior prescriptions or medications, leaving the preprinted checklist of medications blank.

- On or May 7, 2019, Dr. Reyfman of LR Medical PLLC conducted another examination of the Insured and his report failed to assess the prior prescriptions or medications but again recommended a Flector Patch 1.3%, Diclofenac Sodium tablets and Cyclobenzaprine tablets.

- On or about May 7, 2019 DNA Pharmacy purportedly dispensed to the Insured Gabapentin based on an electronic prescription for Neurontin from Dr. Reyfman.

- On or about May 21, 2019, Dr. Reyfman of LR Medical PLLC conducted another examination of the Insured and his report failed to address the prior prescriptions or medications – and made no mention of either Gabapentin or Neurontin that was previously dispensed by DNA Pharmacy – yet again he recommended a Flector Patch 1.3%, Diclofenac Sodium tablets and Cyclobenzaprine tablets.

- On or about June 11, 2019, Dr. Avellini of JAGA Medical Service P.C. conducted another examination of the Insured and failed to address the prior prescriptions/medications, leaving the preprinted checklist of medications blank.

76.     As a further example, an Insured named WV was allegedly involved in an automobile accident. For this Insured alone, VIP Pharmacy billed GEICO approximately $3,240.21 for purportedly dispensing multiple rounds of Cyclobenzaprine and Lidocaine 5% Ointment, Diclofenac 1.5% Gel, and Tizanidine, Diclofenac 1% Gel, and Diclofenac tablets, with different doctors purporting to prescribe the voluminous drugs to the Insured at different times, often without addressing the other drugs prescribed, as shown below:

- On September 7, 2018, Insured WV was allegedly involved in an automobile accident. He was seen at the emergency room of Mt. Sinai Hospital Queens and was discharged on the same date.

- On or about September 13, 2018, the Insured presented at a No-Fault Clinic located at 65-17 Myrtle Avenue, Ridgewood, New York for an initial examination by Dr. Tadros of K.T. Medical Healthcare P.C. Dr. Tadros' initial examination report makes no mention of any prior medication taken by the Insured but indicates that Dr. Tadros would prescribe the Insured Flexeril (Cyclobenzaprine), Motrin, and Lidocaine 5% Ointment.

- On or about September 25, 2018, VIP Pharmacy purportedly dispensed Cyclobenzaprine to the Insured. No prescription for Cyclobenzaprine was attached in support of the bill to GEICO.

- On or about September 27, 2018, VIP Pharmacy purportedly dispensed Lidocaine 5% Ointment to the Insured, pursuant to a purported prescription from Dr. Tadros issued on September 20, 2018.

- On or about October 8, 2018, the Insured was given another initial examination by Dr. Apazidis of Total Spine and Sports Care. Dr. Apazidis' initial examination report makes no mention of the medications that the Insured was prescribed previously.

- On or about October 16, 2018, Dr. Tadros conducted a follow-up examination of the Insured. Dr. Tadros' examination report makes no mention of the medications he prescribed to the Insured previously.

- On or about October 22, 2018, the Insured was given a follow-up examination by Dr. Apazidis. Dr. Apazidis' follow-up examination report makes no mention of the medications the Insured had been previously prescribed.

- On or about October 30, 2018, VIP Pharmacy purportedly dispensed a refill of Lidocaine 5% Ointment to the Insured, pursuant to the purported prescription from Dr. Tadros dated September 20, 2018.

- On or about November 2, 2018, DNA Pharmacy purportedly dispensed Oxycodone/Apap and Meloxicam to the Insured. No prescriptions for either pharmaceutical was attached in support of the bill to GEICO. DNA Pharmacy also dispensed Diclofenac 1.5% Transdermal Solution, pursuant to a purported prescription from Dr. Apazidis issued on that same date.

- On or about November 15, 2018, the Insured was given a follow-up examination by Dr. Tadros. Dr. Tadros' examination report makes no mention of the medications that had been previously prescribed to the Insured.

- On or about November 27, 2018, the Insured presented at a No-Fault Clinic located at 2277-83 Coney Island Avenue, Suite 2A, Brooklyn, New York, for an initial examination with Dr. Reyfman of LR Medical PLLC. Dr. Reyfman's examination report stated only that the Insured's "interim treatment consisted of medication" and that "relieving factors" included "analgesics." Nevertheless, Dr. Reyfman indicated that he would prescribe the Insured Voltaren 1% Gel, Diclofenac tablets, and Zanaflex

- On or about November 28, 2018, VIP Pharmacy purportedly dispensed Tizanidine, Diclofenac 1% Gel, and Diclofenac tablets to the Insured. No prescriptions for any of these medications were attached in support of the bills to GEICO.

- On or about November 29, 2018, VIP Pharmacy purportedly dispensed the final refill of Lidocaine 5% Ointment to the Insured, pursuant to the purported prescription from Dr. Tadros dated September 20, 2018.

- On or about December 12, 2018, Dr. Reyfman conducted a follow-up examination of the Insured and indicated in his examination report that the Insured should continue with Diclofenac tablets and Zanaflex.

- On or about December 20, 2018, Dr. Tadros conducted another follow-up examination of the Insured and again failed to address the Insured's previously prescribed medications in his examination report.

- On or about December 20, 2018, DNA Pharmacy purportedly dispensed Meloxicam to the Insured. No prescription was attached in support of the bill to GEICO.

- On or about January 4, 2019, VIP Pharmacy purportedly dispensed Diclofenac 1% Gel to the Insured. No prescription was attached in support of the bill to GEICO.

- On or about January 17, 2019, Dr. Tadros conducted another follow-up examination of the Insured and again filed to address the Insured's previously prescribed medications in his examination report.

77.    The Defendants' fraudulent scheme to dispense and bill for voluminous medically unnecessary drug products is not only designed to maximize profit without regard to patient care, but it also constitutes therapeutic duplication and increases the risk of adverse drug reactions to the patients subjected to the scheme.

78.     Each year in the United States, more than four million ambulatory care visits and 100,000 deaths occur as a result of adverse drug reactions. A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic duplication. See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

79.     Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as oral and topical nonsteroidal anti-inflammatory drugs ("NSAIDs") (e.g., naproxen and Diclofenac 3% Gel) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

80.     As part of the fraudulent scheme, VIP Pharmacy and DNA Pharmacy intentionally ignored their obligations to conduct a prospective drug review before each prescription was dispensed, including screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, and clinical abuse or misuse, which put the Insureds at risk, so they could maximize their profits without regard to genuine patient care.

**(i)  The Fraudulent Diclofenac Gel**

81.     In accordance with the fraudulent scheme discussed above, the Pharmacy Defendants routinely billed GEICO for exorbitantly priced topical pain gels and ointments, including Diclofenac 3% Gel and Diclofenac 1.5% Solution (collectively, "Topical Diclofenac"), pursuant to prescriptions solicited from the Prescribing Providers and Clinic Controllers.

82.     The Defendants solicited the Prescribing Providers and the Clinic Controllers to provide them with voluminous prescriptions for Topical Diclofenac because the Defendants could readily buy Topical Diclofenac at low cost but have VIP Pharmacy and DNA Pharmacy bill

GEICO and other New York No-Fault insurers huge sums based on egregiously high wholesale list prices.

83.    The United States Food and Drug Administration ("FDA") requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

84.    A "Black Box Warning" is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

85.    Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious adverse gastrointestinal events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

86.    While formulations containing 1% Diclofenac are typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet, they have not been proven effective for treating strains or sprains.

87.    Moreover, Diclofenac 3% Gel, which the Prescribing Providers prescribe, and the Pharmacy Defendants dispense and bill for, is only indicated for the treatment of actinic (or solar) keratosis – a skin condition caused by years of excessive sun exposure.

88.    Topical Diclofenac has no proven efficacy or safety in the treatment of musculoskeletal injuries, nor is the use of Topical Diclofenac to treat musculoskeletal injuries an accepted off-label use.

89.     Notwithstanding the most common and accepted uses for Topical Diclofenac, or the risks associated with the drug, the Pharmacy Defendants steered the Prescribing Providers to prescribe diclofenac sodium in the form of Topical Diclofenac, while they oftentimes recommended the patient continue the use of oral NSAIDs or simultaneously prescribed oral NSAIDs – such as celecoxib, meloxicam, ibuprofen, or naproxen – and other Fraudulent Pharmaceuticals including other Fraudulent Topical Pain Products.

90.     Prescribing Topical Diclofenac, while simultaneously prescribing or recommending the patient take oral NSAIDs, is therapeutic duplication which results in increased risk with no additional therapeutic benefit.

91.     Nevertheless, the Prescribing Providers consciously prescribed and the Pharmacy Defendants consciously dispensed Topical Diclofenac in conjunction with oral NSAIDs and/or other Fraudulent Topical Pain Products to numerous Insureds, despite the risks it posed to the Insureds' health and well-being.  For example:

   i.   Insured RB was allegedly involved in a motor vehicle accident on May 10, 2018. On May 15, 2018, he sought treatment with Corona Medical Plaza P.C. at a No-Fault Clinic located at 104-08 Roosevelt Avenue, Corona, New York and underwent an initial examination with Dr. Avellini. Dr. Avellini indicated on his examination report that Diclofenac 3% Gel and Mobic (Meloxicam) would be prescribed.  Thereafter, on May 23, 2018, June 19, 2018, and July 17, 2018, VIP Pharmacy dispensed Diclofenac 3% Gel along with Meloxicam.

  ii.   Insured KP was allegedly involved in a motor vehicle accident on July 11, 2018. On July 23, 2018, she sought treatment at Rutland Medical P.C. at a No-Fault Clinic located at 71 South Central Avenue, Valley Stream, New York and underwent an initial examination with Marvin Moy, M.D. ("Dr. Moy"). Dr. Moy indicated on his examination report that Diclofenac Cream and Motrin would be prescribed.  Thereafter, on August 7, 2018, DNA Pharmacy dispensed Diclofenac 3% Gel along with Ibuprofen.

 iii.   Insured LF was allegedly involved in a motor vehicle accident on July 26, 2018. On September 12, 2018, he sought treatment at Alexios Apazidis M.D. P.C. at a No-Fault Clinic located at 104-08 Roosevelt Avenue, Corona, New York and underwent an examination with Dr. Apazidis. Dr. Apazidis did not indicate on his

examination report that any medication would be prescribed.  Nevertheless, on October 28, 2018, DNA Pharmacy dispensed Diclofenac 1.5% Transdermal Solution and Meloxicam.

iv.   Insured SB was allegedly involved in a motor vehicle accident on September 4, 2018. On October 17, 2018 she sought treatment at Alexios Apazidis M.D. P.C. at a No-Fault Clinic located at 135-25 79th Street, Suite 2A, Howard Beach, New York and underwent an examination with Dr. Apazidis.  Dr. Apazidis did not indicate on his examination report that any medication would be prescribed. Nevertheless, on November 16, 2018, DNA Pharmacy dispensed Diclofenac 1.5% Transdermal Solution, Meloxicam, Oxycodone, and Acetaminophen.

v.   Insured RC was allegedly involved in a motor vehicle accident on October 13, 2018. On October 17, 2018, she sought treatment with JAGA Medical Services P.C. at a No-Fault Clinic located at 1900B Ralph Avenue, Brooklyn, New York and underwent an initial examination with Alicia Nicholls, P.A. P.A. Nicholls indicated on her examination report that Diclofenac 3% Gel and Mobic (Meloxicam) would be prescribed. Thereafter, on December 15, 2018, DNA Pharmacy dispensed Diclofenac 3% Gel along with Meloxicam.

vi.   Insured LH was allegedly involved in a motor vehicle accident on January 21, 2019. On January 23, 2019, she sought treatment with JAGA Medical Services P.C. at a No-Fault Clinic located at 1900B Ralph Avenue, Brooklyn, New York and underwent an initial examination with Alicia Nicholls, P.A. P.A. Nicholls indicated on her examination report that Diclofenac 3% Gel and Mobic (Meloxicam) would be prescribed. Thereafter, on January 29, 2019, DNA Pharmacy dispensed Diclofenac 3% Gel along with Meloxicam.

vii.   Insured PA was allegedly involved in a motor vehicle accident on January 25, 2019. On February 20, 2019, he sought treatment with Corona Medical Plaza P.C. at a No-Fault Clinic located at 104-08 Roosevelt Avenue, Corona, New York and underwent an initial examination with Avellini. Dr. Avellini indicated on his examination report that Diclofenac 3% Gel and Mobic (Meloxicam) would be prescribed. Thereafter, on March 8, 2019, April 10, 2019, and May 8, 2019, VIP Pharmacy dispensed Diclofenac 3% Gel along with Meloxicam.

viii.   Insured JR was allegedly involved in a motor vehicle accident on January 25, 2019. On February 20, 2019, he sought treatment with Corona Medical Plaza P.C. at a No-Fault Clinic located at 104-08 Roosevelt Avenue, Corona, New York and underwent an initial examination with Avellini. Dr. Avellini indicated on his examination report that Diclofenac 3% Gel and Mobic (Meloxicam) would be prescribed. Thereafter, on March 8, 2019, April 17, 2019, and May 8, 2019, VIP Pharmacy dispensed Diclofenac 3% Gel along with Meloxicam.

ix.   Insured AS was allegedly involved in a motor vehicle accident on February 22, 2019. On February 26, 2019, he sought treatment with Corona Medical Plaza P.C.

at a No-Fault Clinic located at 104-08 Roosevelt Avenue, Corona, New York and underwent an initial examination with Dr. Avellini. Dr. Avellini indicated on his examination report that Diclofenac 3% Gel and Mobic (Meloxicam) would be prescribed. Thereafter, on April 6, 2019, May 9, 2019, and May 31, 2019, VIP Pharmacy dispensed Diclofenac 3% Gel along with Meloxicam.

x. Insured CH was allegedly involved in a motor vehicle accident on February 20, 2019. On February 26, 2019, he sought treatment with Corona Medical Plaza P.C. at a No-Fault Clinic located at 104-08 Roosevelt Avenue, Corona, New York and underwent an initial examination with Dr. Avellini. Dr. Avellini indicated on his examination report that Diclofenac 3% Gel and Mobic (Meloxicam) would be prescribed. Thereafter, on March 11, 2019, April 17, 2019, and May 15, 2019, VIP Pharmacy dispensed Diclofenac 3% Gel along with Meloxicam.

92. By prescribing and dispensing Topical Diclofenac in conjunction with oral NSAIDs and other Fraudulent Topical Pain Products, the Prescribing Providers and the Pharmacy Defendants engaged in therapeutic duplication and put patients at increased risk of serious cardiovascular and gastrointestinal events as the use of oral NSAIDs increases the "Black Box Warning" risks associated with diclofenac sodium.

93. The Topical Diclofenac was prescribed pursuant to collusive arrangements and predetermined treatment protocols, and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications proven to have therapeutic effects and available at a fraction of the cost.

94. In keeping with the fact that Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the initial examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the prescriptions and, in some cases, failed to acknowledge that the patient was even being prescribed Topical Diclofenac.

95. In further keeping with the fact that the Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the

follow-up examination reports performed by the Prescribing Providers virtually never addressed whether the Topical Diclofenac prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

96.     The Pharmacy Defendants' billing submitted through VIP Pharmacy and DNA Pharmacy to GEICO for Topical Diclofenac exceeded $2,637,600.00.

97.     Specifically, the Pharmacy Defendants almost exclusively dispensed and billed for diclofenac sodium in the form of Diclofenac 3% Gel and Diclofenac 1.5% Transdermal Solution.

98.     VIP Pharmacy typically billed GEICO $944.00 for a single tube of Diclofenac 3% Gel and, to-date, billed GEICO over $609,513.00 for this Fraudulent Topical Pain Product.

99.     DNA Pharmacy typically billed GEICO $944.00 for a single tube of Diclofenac 3% Gel and, to-date, billed GEICO over $1,027,800.00 for this Fraudulent Topical Pain Product.  DNA Pharmacy also typically billed GEICO between $945.00 and $1,168.50 for Diclofenac 1.5% Transdermal Solution, and to date has billed GEICO over $979,200.00 for this Fraudulent Topical Pain Product.

100.    Not surprisingly, the Office of Inspector General of the U.S. Department of Health & Human Services recently issued a report which noted that one of the most common products billed for by pharmacies with questionable billing was diclofenac sodium because, among other reasons, there is a striking difference between the cost of a compounded topical formulation containing diclofenac sodium and a non-compounded version of the same drug. In that same report, the OIG also noted that many pharmacies in New York State are among the most questionable in the nation. See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

**(ii) <u>The Fraudulent Lidocaine Ointment</u>**

101.    In addition to the egregious number of Topical Diclofenac prescriptions dispensed by the Pharmacy Defendants, in accordance with the fraudulent scheme discussed above, the Pharmacy Defendants routinely billed GEICO for exorbitantly priced topical Lidocaine 5% Ointment ("Topical Lidocaine 5%"), pursuant to prescriptions solicited from the Prescribing Providers and Clinic Controllers.

102.    Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the body. Topical Lidocaine 5% is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.  Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

103.    Excessive dosage or short intervals between doses of Topical Lidocaine 5% can cause serious effects.   Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Topical Lidocaine 5% should not exceed five grams.

104.    Despite this, the Prescribing Providers never recommended Insureds first use over-the-counter lidocaine ointments or lotions to treat their minor aches and pains which they sustained in fender-bender type motor vehicle accidents. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribing Providers and Clinic Controllers routinely prescribed to Insureds, or caused the prescription of, Topical Lidocaine 5% and directed the prescriptions to VIP Pharmacy and DNA Pharmacy.

105.    For example, the Prescribing Providers never recommended insureds first try Icy Hot Lidocaine, Salonpas Lidocaine, or Aspercreme with Lidocaine, all of which contain 4% lidocaine and are available at most well-known pharmacy retailers at a mere fraction of the cost.

106.    In keeping with the fact that the Pharmacy Defendants submitted bills pursuant to collusive arrangements with the Prescribing Providers and Clinic Controllers and pursuant to fraudulent, predetermined and profit-driven treatment protocols, the Topical Lidocaine 5% prescriptions, like the Topical Diclofenac prescriptions, were often issued contemporaneous to over-the-counter oral NSAIDs.

107.    As with the prescriptions for Topical Diclofenac, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the prescriptions and, in some cases, failed to acknowledge that the patient was prescribed Topical Lidocaine 5%.  Likewise, the follow-up examination reports virtually never addressed whether the Topical Lidocaine 5% prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

108.    Notably, the Pharmacy Defendants' billing submitted through VIP Pharmacy and DNA Pharmacy to GEICO for Topical Lidocaine 5% exceeded $1,064,400.00.

109.    VIP Pharmacy typically billed GEICO between $304.50 and $1,966.00 for a single tube of Topical Lidocaine 5% and, to-date, billed GEICO over $582,000.00 for this Fraudulent Topical Pain Product.

110.    DNA Pharmacy typically billed GEICO between $304.50 and $3,932.00 for a single prescription of Topical Lidocaine 5% and, to-date, billed GEICO over $482,400.00 for this Fraudulent Topical Pain Product.

111.    The Pharmacy Defendants' egregious billing coupled with the fact that the Prescribing Providers failed to properly document the prescriptions for Topical Lidocaine 5%, or the Insureds' use of this medication, further indicates that there is no legitimate medical reason for the Prescribing Providers to have prescribed, and VIP Pharmacy and DNA Pharmacy to have dispensed, large volumes of this medication to the Insureds, particularly given the potential for adverse health effects.

**(iii) The Fraudulent Pain Patch Prescriptions**

112.    As a further part of the scheme, the Pharmacy Defendants routinely billed GEICO for exorbitantly priced pain patches in the form of Lidocaine 5% Patches ("Lidocaine Patches"), Diclofenac Patches, and Flector Transdermal Patches 1.3% ("Flector Patches") (which also contain diclofenac) (together, the "Fraudulent Pain Patches"), pursuant to prescriptions solicited from the Prescribing Providers and Clinic Controllers.

113.    In keeping with the fact that the Pharmacy Defendants steered the Prescribing Providers to prescribe the Fraudulent Pharmaceuticals pursuant to predetermined protocols designed to maximize profits without regard for patient care, the Fraudulent Pain Patches were routinely dispensed and billed at exorbitant prices despite the fact that there are other, less expensive, commercially available FDA-approved patches available.

114.    Notably, topical pain patches in which the primary ingredient is lidocaine are mainly used to treat *chronic post-herpetic neuropathic* pain (i.e., continued nerve pain after a patient recovers from shingles), although studies have shown that any relief these patches provide – beyond topical anesthetic relief – is more attributable to its placebo effect rather than the pharmacological action of the patches themselves.  In fact, while application of pain patches in

which the primary ingredient is lidocaine provides sufficient absorption to cause an anesthetic effect, it is insufficient to produce a complete sensory block.

115.   Nevertheless, the Prescribing Providers routinely prescribed the Fraudulent Pain Patches to Insureds for sprain/strain injuries sustained in fender-bender type motor vehicle accidents.

116.   Like the prescriptions for the other Fraudulent Topical Pain Products, the Prescribing Providers never recommended Insureds first use over-the-counter patches– which are available to treat their often acute, minor strain/sprain injuries. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribing Providers routinely prescribed Insureds Lidocaine Patches, Diclofenac Patches, or Flector Patches.

117.   As with the prescriptions for the other Fraudulent Topical Pain Products, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the prescriptions and, in some cases, failed to acknowledge that the patient was even prescribed a Fraudulent Pain Patch. Likewise, the follow-up examination reports virtually never addressed whether the Fraudulent Pain Patches prescribed provided any pain relief to the patient or were otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

118.   In keeping with the fact that the Pharmacy Defendants acted with gross indifference to patient care and safety, the patients were generally not instructed on the safe use, side effects or risks associated with the Fraudulent Pain Patches.

119.   Notably, the Pharmacy Defendants' billing submitted through VIP Pharmacy and DNA Pharmacy to GEICO for Fraudulent Pain Patches exceeded $689,000.00.

120.    VIP Pharmacy typically billed GEICO between $286.33 and $1,316.19 per prescription for Flector Patches and between $220.66 and $678.94 per prescription for Lidocaine Patches.  To-date, VIP Pharmacy billed GEICO over $453,200.00 for Flector Patches and over $28,900.00 for Lidocaine Patches, totaling in excess of $482,100.00 in billing for Fraudulent Pain Patches.

121.    DNA Pharmacy typically billed GEICO between $371.70 and $743.40 per prescription for Flector Patches and Diclofenac Patches, and between $224.70 and $739.80 per prescription for Lidocaine Patches.  To-date, DNA Pharmacy billed GEICO a total of over $13,100.00 for Flector Patches and Diclofenac Patches, and over $193,800.00 for Lidocaine Patches, totaling in excess of $206,900.00 in billing for Fraudulent Pain Patches.

### C.  **The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Among VIP Pharmacy and DNA Pharmacy, the Prescribing Providers, and the Clinic Controllers**

122.    To effectuate the fraudulent scheme, the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to VIP Pharmacy and DNA Pharmacy for large volumes of the Fraudulent Pharmaceuticals pursuant to their collusive arrangements, which egregiously inflated the charges submitted to GEICO.

123.    New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

124.    Here, the Pharmacy Defendants colluded with the Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have

the Prescribing Providers prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and then to have those prescriptions directed to VIP Pharmacy and DNA Pharmacy so that the Pharmacy Defendants could bill GEICO huge sums.

125.   In furtherance of the scheme, the Prescribing Providers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics pursuant to the collusive arrangements and fraudulent predetermined protocols, and without regard to genuine patient care, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

126.   The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics, while the Pharmacy Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that they were involved in illegal, collusive arrangements designed to exploit the patients for financial gain; that the Fraudulent Pharmaceuticals were often prescribed and dispensed without regard to pharmacologic outcomes; that the Fraudulent Pharmaceuticals were prescribed and dispensed with gross indifference to patient health, care and safety; that the Fraudulent Topical Pain Products were prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; and that the Fraudulent Pharmaceuticals were prescribed and dispensed without any attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

127.   The Pharmacy Defendants, in collusion with the Prescribing Providers and Clinic Controllers, made sure that the Insureds never had the option to use a pharmacy of their choosing, and instead ensured that the prescriptions for the Fraudulent Pharmaceuticals were directed to VIP Pharmacy and DNA Pharmacy, notwithstanding that (i) in many instances the No-Fault Clinics

and the patients themselves were located far from VIP Pharmacy and DNA Pharmacy in Queens and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients.

128.    VIP Pharmacy and DNA Pharmacy purported to mail or deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes, without the patient ever receiving the actual written prescription and, in many cases, without the patient even knowing that they were to receive a Fraudulent Pharmaceutical.

129.    Alternatively, the Insureds were given the Fraudulent Pharmaceuticals dispensed by VIP Pharmacy and DNA Pharmacy directly from the front desk staff at the various No-Fault Clinics, again without ever seeing the actual prescription or, in many cases, not even knowing that they were to receive a Fraudulent Pharmaceutical.

130.    The Pharmacy Defendants, the Prescribing Providers and the Clinic Controllers did not give the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by VIP Pharmacy and DNA Pharmacy and to ensure that the Defendants benefitted financially from the prescriptions.

131.    The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

132.    The Prescribing Providers and the Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to VIP Pharmacy and DNA Pharmacy rather than to a multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to many of the patients.

133.    The Pharmacy Defendants had no legitimate reason to dispense, or purport to dispense, the Fraudulent Pharmaceuticals that were (i) often prescribed and dispensed without

regard to pharmacologic outcomes; (ii) prescribed and dispensed with gross indifference to patient health, care and safety; (iii) prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; and (iv) prescribed and dispensed without any attention to cost, fiscal responsibility, and duplication, because, among other things, all pharmacists in New York are required to conduct a prospective drug review before each prescription is dispensed, which review shall include screening for therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, medical contraindication, and clinical abuse or misuse.

134.    The Pharmacy Defendants, the Prescribing Providers and the Clinic Controllers would not have engaged in the illegal, collusive arrangements in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals and directing those prescriptions to VIP Pharmacy and DNA Pharmacy, unless they profited from their participation in the illegal scheme.

135.    But for the payments of kickbacks or other financial incentives from the Pharmacy Defendants, the Prescribing Providers would not have prescribed the Fraudulent Topical Pain Products, or the volume of other Fraudulent Pharmaceuticals, and the Prescribing Providers and Clinic Controllers would not have directed the prescriptions to VIP Pharmacy and DNA Pharmacy.

136.    The Pharmacy Defendants, Prescribing Providers and Clinic Controllers affirmatively concealed the nature of their collusive relationships and the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

137.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Pharmacy Defendants paid a financial kickback or provided other financial

incentives, and the Prescribing Providers and Clinic Controllers received a financial kickback or other financial incentive, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by VIP Pharmacy and DNA Pharmacy.

138.    The Pharmacy Defendants effectuated the payment of kickbacks by, among other things, paying entities that purported to provide legitimate business services, such as "computer services," but these entities provided no legitimate services and instead were used as vehicles to conceal the payments made as kickbacks in return for the steering of medically unnecessary prescriptions to VIP Pharmacy and DNA Pharmacy.

139.    Upon information and belief, the payment of kickbacks was made at or near the time the prescriptions were issued.

### D.  <u>The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO</u>

140.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

141.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

142.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

143.    For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

144.    The Pharmacy Defendants solicited the Clinic Controllers and the Prescribing Providers to provide them with voluminous prescriptions for the Fraudulent Topical Pain Products because the Pharmacy Defendants could readily buy the Fraudulent Topical Pain Products at low cost but bill GEICO and other New York No-Fault insurers exorbitant amounts based on inflated AWPs, or average wholesale prices.

145.    The Defendants intentionally targeted the Fraudulent Topical Pain Products with extremely expensive average wholesale prices in order to inflate VIP Pharmacy and DNA Pharmacy's billing and maximize their profits.

146.    In support of their billing to GEICO, the Pharmacy Defendants never submitted their wholesale purchase invoices demonstrating (i) how much VIP Pharmacy and DNA Pharmacy actually paid the supplier for the Fraudulent Topical Pain Products and (ii) whether VIP Pharmacy and DNA Pharmacy actually purchased pharmaceutical products with the particular NDC number used in the billing, representing purchases from a particular supplier in a particular quantity.

147.    In fact, VIP Pharmacy and DNA Pharmacy never actually paid the targeted and egregious "average wholesale price" of the Fraudulent Pharmaceuticals that it dispensed, or purported to dispense, because it is not a true representation of actual market price and is far above the actual acquisition cost for the Fraudulent Pharmaceuticals, and particularly the Fraudulent Topical Pain Products.

148.    VIP Pharmacy and DNA Pharmacy paid only a fraction of the "average wholesale price" of the Fraudulent Topical Pain Products that the Defendants targeted to use in connection

with VIP Pharmacy and DNA Pharmacy's billing, but nevertheless billed GEICO and other No-Fault insurers amounts far surpassing the cost of an array of other FDA-approved, proven effective medications that could have been prescribed and dispensed.

## IV.   The Defendants' Submission of Fraudulent NF-3 Forms to GEICO

149.    To support the fraudulent charges, the Defendants consistently submitted statutorily prescribed claim forms for No-Fault Benefits or their equivalent, on behalf of VIP Pharmacy and DNA Pharmacy, seeking payment for the pharmaceuticals for which they were ineligible to receive payment.

150.    These forms, including NF-3 forms, HCFA-1500 forms and/or other supporting records that the Defendants submitted or caused to be submitted to GEICO, were false and misleading in the following material respects:

   a. The NF-3 forms, HCFA-1500 forms, and/or other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care;

   b. The NF-3 forms, HCFA-1500 forms, and/or other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants engaged in illegal, collusive relationships with the Prescribing Providers and Clinic Controllers in order to steer voluminous and illegal prescriptions to VIP Pharmacy and DNA Pharmacy for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives; and

   c. The NF-3 forms, HCFA-1500 forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products that

they could acquire at low cost and dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals.

## V.   **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

151.   The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to the Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

152.   To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

153.   Specifically, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Pharmacy Defendants were involved in collusive, kickback arrangements with the Prescribing Providers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing to GEICO and other New York insurance companies; and (iii) the Defendants intentionally targeted a specific set of pharmaceutical products that they acquired at low cost and dispensed in large volumes to Insureds with inflated charges without regard for the availability of other prescription and over-the-counter medications.

154.   The Defendants also billed for the Fraudulent Pharmaceuticals under two separate pharmacy names, based on purported prescriptions from the Prescribing Providers operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single licensee and submitted by one pharmacy.

155.   The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, did not reveal its fraudulent nature.

156.    The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.  In fact, VIP Pharmacy and DNA Pharmacy continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that VIP Pharmacy and DNA Pharmacy engaged in fraud.

157.    The Defendants' continued collection efforts through numerous, separate collection proceedings is an essential part of their fraudulent scheme since they know it is impractical for a No-Fault arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale, complex fraud scheme involving the prescription and dispensing of fraudulent pharmaceutical to hundreds of patients across numerous different No-Fault Clinics located throughout the New York metropolitan area.

158.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.

159.    The facially valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to, and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $1,840,000.00 representing payments made by GEICO based upon the fraudulent charges submitted by the Pharmacy Defendants.

160.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## THE FIRST CLAIM FOR RELIEF
### Against the Pharmacy Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

161.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

162.    There is an actual case in controversy between GEICO and the Pharmacy Defendants (i.e., VIP Pharmacy, DNA Pharmacy, Mosheyeva, and Liveyev) regarding approximately $2,645,000.00 in pending fraudulent billing for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted to GEICO through VIP Pharmacy and DNA Pharmacy.

163.    The Pharmacy Defendants have no right to receive payment for any pending bills submitted to GEICO through VIP Pharmacy and DNA Pharmacy because:

(i)     VIP Pharmacy and DNA Pharmacy billed for pharmaceutical products that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)    the Pharmacy Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to VIP Pharmacy and DNA Pharmacy in exchange for unlawful kickbacks and other financial incentives; and

(iii)   the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had VIP Pharmacy and DNA Pharmacy dispense in large volumes to Insureds with inflated charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

164.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that VIP Pharmacy and DNA Pharmacy have no right to receive payment for any pending bills submitted to GEICO.

## THE SECOND CLAIM FOR RELIEF
### Against Mosheyeva, Liveyev, and John Does "1" - "5"
### (Violation of RICO, 18 U.S.C. § 1962(c))

165.    GEICO incorporates, as though fully set forth herein, each and every allegation in

the paragraphs set forth above.

166.    VIP Pharmacy and DNA Pharmacy are an ongoing "enterprise" (the "VIP-DNA

Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect

interstate commerce.

167.    Mosheyeva, Liveyev, and John Does "1" – "5" knowingly have conducted and/or

participated, directly or indirectly, in the conduct of the VIP-DNA Enterprise's affairs through a

pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute,

18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted

thousands of fraudulent charges and continuous efforts to collect on those charges to the present,

seeking payments that VIP Pharmacy and DNA Pharmacy were not eligible to receive under the

No-Fault Laws because: (i) the billed-for services were not medically necessary and/or were the

product of predetermined fraudulent protocols designed to exploit the patients for financial gain,

without regard for genuine patient care; (ii) the Pharmacy Defendants participated in illegal,

collusive relationships in which the Pharmacy Defendants steered the Prescribing Providers and

Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to VIP

Pharmacy and DNA Pharmacy in exchange for unlawful kickbacks and other financial incentives;

and (iii) the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products

that they could acquire at low cost and dispense in large volumes to Insureds with egregious

charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation

of law.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise the

pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1" and "2".

168.    The VIP-DNA Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Mosheyeva, Liveyev, and John Does "1" – "5" operated the pharmacies, inasmuch as VIP Pharmacy and DNA Pharmacy never were eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the VIP-DNA Enterprise to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud by the VIP-DNA Enterprise implies a threat of continued criminal activity, as does the fact that the Defendants have recently submitted further billing to GEICO while continuing to attempt collection on the fraudulent billing submitted through VIP Pharmacy and DNA Pharmacy to the present day.

169.    The VIP-DNA Enterprise is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York No-Fault insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants.  These inherently unlawful acts are taken by the VIP-DNA Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

170.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $1,840,000.00 pursuant to the fraudulent bills submitted by the Defendants through the VIP-DNA Enterprise.

171.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THE THIRD CLAIM FOR RELIEF**
**Against Mosheyeva, Liveyev and John Does "1" – "5"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

172.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

173.    The VIP-DNA Enterprise is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

174.    Mosheyeva, Liveyev, and John Does "1" – "5" are employed by and/or associated with the VIP-DNA Enterprise.

175.    Mosheyeva, Liveyev, and John Does "1" – "5" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the VIP-DNA Enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted hundreds of fraudulent charges and continuous efforts to collect on those charges seeking payments that the VIP-DNA Enterprise was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Pharmacy Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to VIP Pharmacy and DNA Pharmacy in exchange for unlawful kickbacks and other financial incentives;

and (iii) the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.  The charts attached hereto as Exhibit "1" and "2" sets forth the fraudulent claims that have been identified to-date which the Defendants submitted, or caused to be submitted, to GEICO through the United States mail and which comprise, in part, the pattern of racketeering activity identified through the date of this Complaint.

176.    Mosheyeva, Liveyev, and John Does "1" – "5" knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

177.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $1,840,000.00 pursuant to the fraudulent bills submitted by the VIP-DNA Enterprise.

178.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THE FOURTH CLAIM FOR RELIEF
**Against Mosheyeva, VIP Pharmacy and John Does "1" – "5"**
**(Common Law Fraud)**

179.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

180.    Mosheyeva, VIP Pharmacy and John Does "1" – "5" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from

GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of VIP Pharmacy.

181.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that VIP Pharmacy was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Pharmacy Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to VIP Pharmacy in exchange for unlawful kickbacks and other financial incentives; and (iii) in every claim, the representation that VIP Pharmacy was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with inflated charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

182.    Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through VIP Pharmacy that were not compensable under the No-Fault Laws.

183.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $828,500.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by Defendants through VIP Pharmacy.

184.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

185.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE FIFTH CLAIM FOR RELIEF
### Against Mosheyeva, VIP Pharmacy and John Does "1" – "5"
### (Unjust Enrichment)

186.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

187.    As set forth above, Defendants Mosheyeva, VIP Pharmacy and John Does "1" – "5" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

188.    When GEICO paid the bills and charges submitted by or on behalf of VIP Pharmacy for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

189.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

190.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

191.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $828,500.00.

## THE SIXTH CLAIM FOR RELIEF
### Against Liveyev, DNA Pharmacy and John Does "1" – "5"
### (Common Law Fraud)

192.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

193.    Liveyev, DNA Pharmacy and John Does "1" – "5" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of DNA Pharmacy.

194.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that DNA Pharmacy was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Pharmacy Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to DNA Pharmacy in exchange for unlawful kickbacks and other financial incentives; and (iii) in every

claim, the representation that DNA Pharmacy was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with inflated charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

195.     The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through DNA Pharmacy that were not compensable under the No-Fault Laws.

196.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $1,012,000.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through DNA Pharmacy.

197.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

198.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE SEVENTH CLAIM FOR RELIEF
### Against Liveyev, DNA Pharmacy, and John Does "1" – "5"
### (Unjust Enrichment)

199.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

200.     As set forth above, Liveyev, DNA Pharmacy and John Does "1" – "5" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

201.    When GEICO paid the bills and charges submitted by or on behalf of DNA Pharmacy for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

202.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

203.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

204.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $1,012,000.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.    On the First Claim for Relief against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that VIP Pharmacy and DNA Pharmacy have no right to receive payment for any pending bills, amounting to approximately $2,645,000.00 in charges submitted to GEICO;

B.    On the Second Claim For Relief against Mosheyeva, Liveyev, and John Does "1" – "5", compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $1,840,000.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.      On the Third Claim For Relief against Mosheyeva, Liveyev, and John Does "1" – "5", compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $1,840,000.00 together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D.      On the Fourth Claim for Relief against Mosheyeva, VIP Pharmacy, and John Does "1" – "5", compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $828,500.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Claim for Relief against Mosheyeva, VIP Pharmacy, and John Does "1" – "5", a recovery in favor of GEICO in an amount to be determined at trial but approximately $828,500.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth  Claim for Relief against Liveyev, DNA Pharmacy, and John Does "1" – "5", compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $1,012,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

G.      On the Seventh Claim for Relief against Liveyev, DNA Pharmacy, and John Does "1" – "5", a recovery in favor of GEICO in an amount to be determined at trial but approximately $1,012,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated:  Uniondale, New York
        March 12, 2021

                                    RIVKIN RADLER LLP


                                    By:   */s/  Michael A. Sirignano*
                                          Michael A. Sirignano, Esq. (MS 5263)
                                          Barry I. Levy, Esq. (BL 2190)
                                          Joshua D. Smith, Esq. (JS 3989)
                                          Blythe C. Miller, Esq.  (BM 8894)

                                          926 RXR Plaza
                                          Uniondale, New York 11556
                                          (516) 357-3000

                                          *Counsel for Plaintiffs, Government
                                          Employees Insurance Company, GEICO
                                          Indemnity Company GEICO General
                                          Insurance Company and GEICO Casualty*